UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


ROSE SAMS,                            )        CASE NO. 5:06CV3040
                                      )
                    Plaintiff,        )        MAGISTRATE JUDGE
                                      )        GEORGE J. LIMBERT
        v.                            )
_____               )
                                      )
NORTHCOAST BEHAVIORAL HEALTH )                 **MEMORANDUM OPINION & ORDER**
CARE CENTER,                          )
                                      )
                    Defendant.        )


The above case is before this Court on a motion for summary judgment filed by Defendant

Northcoast Behavioral Health Care Center (Defendant).  ECF Dkt. #30.  Plaintiff Rose Sams

(Plaintiff) has filed a brief opposing the motion for summary judgment and Defendant has filed a

reply.  ECF Dkt. #s 31, 33.  For the following reasons, this Court GRANTS Defendant's motion for

summary judgment and dismisses Plaintiff's complaint with prejudice.  ECF Dkt. #s 1, 30.

**A.      FACTUAL BACKGROUND**

_____Plaintiff, an African-American female with a Bachelor of Science degree in Nursing, is a

registered nurse who began working for Defendant in February 1998 as a Psychiatric/Mental

Retardation (Psych/MR) Nurse.  ECF Dkt. #25 at 21.  Plaintiff resigned from this position in early

1999 in order to pursue other areas of medicine beyond psychiatric nursing.  *Id.* at 32.  During her

first term of employment with Defendant, Plaintiff was "very happy", had no negative employment

actions taken against her and reported no discrimination.  *Id.* at 31-33.

_____Plaintiff pursued other employment opportunities, but decided to return to the employ of

1

Defendant in February 2002 again as a Psych/MR nurse. ECF Dkt. #25 at 39. Plaintiff worked the third shift when she returned in Unit 22A, which is a non-forensic, Intensified Specialized Services (ISS) unit. *Id*. at 40. Her night shift building supervisor was Clinical Nurse Manager (CNM) Andjelka Ivasic, and the unit CNM was Barb Fenton. *Id*. at 42-43.

        On October 6, 2002, Plaintiff was promoted to Psych/MR Nurse Supervisor and received a pay increase, as well as a change in shifts from the third to the second shift. ECF Dkt. #25 at 48-51. In this capacity, Plaintiff supervised numerous nurses and at times had supervisory responsibility for monitoring all of the nurses working on the campus. *Id*. at 49. Plaintiff directly reported to Michael Waggoner, a Caucasian, who was a CNM on the first shift. *Id*. at 57-58. There were six CNMs in total, Waggoner, Inder Sherma, Annie Travassos, Pam Chasteen, Amy Frate, and Barb Fenton. *Id*. at 59-60. They reported to Associate Nurse Executive (ANE) Jeff Sims, an African-American. *Id.* at 60. ANE Sims reported to Sue Kajfasz, the Vice President of Nursing, a Caucasian. *Id.* Ms. Kajfasz reported to the Northcoast Chief Executive Officer (CEO), who changed from Tom Cheek to Paul Guggenheim while Plaintiff worked there. *Id.* at 62-63.

        In March 2004, Plaintiff began a disability leave of absence due to arthritis in her knees for which she underwent a bilateral knee replacement. ECF Dkt. #25 at 65. Plaintiff remained on disability leave from March 2004 through July 2005, except for two days when she attempted to come back to work in February 2005 but could not do so. *Id.* at 65-66. Before she left on disability, Plaintiff was working first shift. *Id*. at 105.

        Upon her July 2005 return, Plaintiff was assigned back to the third shift as a Nurse Supervisor and was told that her first shift position had been eliminated due to budget cutbacks. ECF Dkt. #25 at 105. However, according to Plaintiff, Pam Chasteen, a white CNM, had used disability leave

2

repeatedly and always returned to the same position and shift upon her return. *Id*. at 153-154. Plaintiff also stated that the unit CNM, Barb Fenton, a white female, used disability leave and was returned to her same position and shift upon her return. *Id*. at 154.

      Plaintiff thereafter asked a second-shift co-worker, Gloria Shelton, to trade shifts with her since Plaintiff wanted to be on second shift to take care of her grandson and Ms. Shelton wanted third shift to care for her family. ECF Dkt. #25 at 108-109, 113-114. Mr. Waggoner and Shadina Terry, Ms. Shelton's CNM and an African-American, denied the request due to attendance problems in supervision. *Id*. at 114. Plaintiff was informed that if nursing supervision attendance improved in the next six months, the change would be reconsidered. *Id.* at 114. Plaintiff indicated that she was never informed that she had an attendance problem until that time. *Id.* at 121. At this time, according to Plaintiff, a second shift supervisor position was available but she was not told of it. *Id*.

      Sometime between July and November 2005, Plaintiff applied for a position as a CNM and Ms. Kajfasz, Mr. Sims, Mr. Waggoner, and Gene Briers interviewed her. ECF Dkt. #25 at 160. Plaintiff avers that she was not selected for the position because the individuals that interviewed her automatically scored her lower on the interview because of her race. *Id.* at 160-161. According to Plaintiff, the interview was the most critical factor in selecting an applicant. *Id*. at 160. Kim Knoll, a Caucasian, was selected for the position. *Id*. While Plaintiff was informed that Ms. Knoll scored better on the interview and was also hired because she had a Master's Degree, Plaintiff noted that Mr. Waggoner was selected as a CNM over her and he had only an Associate's Degree at the time. *Id*. at 164. Plaintiff indicated that Mr. Sims told Plaintiff that he had promoted Waggoner in order to deflect criticism from other CNMs, specifically Annie Trevassos, for hiring too many African-Americans. *Id*. at 82-84.

3

Plaintiff further avers that Mr. Waggoner racially discriminated against her because she reported misconduct and misfeasance on the part of white nurses on her shift and Mr. Waggoner took no actions and did not discuss these reports with her. ECF Dkt. #25 at 165-166. Yet when she reported the misconduct of black employees, Plaintiff indicated that Mr. Waggoner would follow up with her on them. *Id*. at 172. She also noted that Mr. Waggoner hired a disproportionate amount of white females and gave them favored schedules. *Id.* at 166.

Mr. Sims also encouraged Plaintiff to apply for a lateral position into a Psych/MR Nurse Supervisor position at Defendant's Cleveland Campus for a second shift position. ECF Dkt. #25 at 177. She bid on the job and was asked to interview for the position by Linda Rhea, a Caucasian ANE at the Cleveland Campus. *Id.* She was told that two other persons, CNMs who had more authority and made more money than supervisors, had applied for the job as well. *Id.* at 178-180. Plaintiff refused to interview for the position, indicating that having to interview for a lateral movement had never been the practice before and other employees had received lateral transfers without having to interview. *Id*.

Plaintiff also complained of racial slurs directed at her by Ms. Travassos, a CNM of Indian descent who did not have direct supervisory authority over her. ECF Dkt. #25 at 227. Upon her return from disability leave, Plaintiff stated that Ms. Travassos reportedly was "not very nice" and was "very short" with her. *Id*. at 83-84. Plaintiff averred that Ms. Travassos told her that all black people should die after learning that an African-American employee would be off indefinitely due to a kidney problem and Ms. Travassos also commented to Andjelka Ivasic, the night shift supervisor who directly supervised Plaintiff, that she did not care about Plaintiff's grandson, called him a "black bastard" and stated that "all black people do is lay down and have children, and make them (white people) take care of them." *Id*. at 229. Plaintiff further complained that upon returning to work with

4

a cane after her bilateral knee replacement, Ms. Travassos kicked over her cane numerous times. *Id.* at 145-146.  Plaintiff also complained that Ms. Travassos told her that she was fat and lazy in a way that Plaintiff interpreted as racially hostile. *Id.* at 227-231.  Ms. Travassos apologized for this comment two days later. *Id.* at 231.  Ms. Ivasic also told Plaintiff that Ms. Travassos referred to another employee as a "wasted piece of black meat" and had called her "lazy and useless." *Id.* at 232.

Plaintiff indicated that she reported at least one of Ms. Travassos' comments to CNM Lynn Veal and she was told to report the comments to Mr. Sims, which she did, but "he turned his back" on Plaintiff.  ECF Dkt. #25 at 234.  The union then came in and notified Mr. Sims that Ms. Travassos had been making disparaging comments about African-Americans.  ECF Dkt. #27 at 37.  Mr. Sims conducted an investigation and indicated that he found no evidence to substantiate the racial incidents upon which the complaint was based. *Id.*  Plaintiff further alleges that she went to Mr. Waggoner about the racial comments and he told her that he would set up a meeting for the two of them, but he never did.  ECF Dkt. #25 at 185-186.  Plaintiff, however, states in her opposition brief to the motion for summary judgment that Mr. Waggoner e-mailed a meeting time to her while she was off sick and when the meeting was set, she fell ill and had to cancel, but Waggoner did not reschedule the meeting.  ECF Dkt. #31 at 7.

Plaintiff filed her first charge with the Ohio Civil Rights Commission (OCRC)

Plaintiff also complains about a written reprimand that Mr. Waggoner imposed after she sent him an e-mail about a patient incident.  ECF Dkt. #31 at 6.  Mr. Waggoner reprimanded Plaintiff because he believed that her e-mail to him was disrespectful.  ECF Dkt. #30, Exhibit K.  Plaintiff grieved the reprimand, but the Hearing Officer upheld the reprimand. *Id.*  This was the first time that Plaintiff had been disciplined.  Plaintiff contends that this reprimand was in retaliation for her filing of an Ohio Civil Rights Commission (OCRC) charge.  In her first OCRC charge drafted on February

5

23, 2006, Plaintiff claims that she limited her complaints to disability discrimination because while she was initially interested in filing charges of disability, gender and race discrimination, the OCRC representative told her that she should narrow her complaint.  ECF Dkt. #25 at 156.

Prior to filing her first OCRC charge, Plaintiff set up a meeting with Defendant's CEO, Paul Guggenheim.  ECF Dkt. #25 at 185.  At the meeting, Plaintiff discussed her main concern of childcare and her difficulties in remaining on third shift.  *Id*. at 189.  Plaintiff also expressed concerns regarding Mr. Sims' hiring practices, especially lateral movements.  *Id*. at 190-191.  CEO Guggenheim e-mailed Plaintiff with an outline of the topics covered at their meeting.  *Id.* at190-192.

On February 7, 2006, following Ms. Travassos' comments to Ms. Ivasic about not liking African-Americans and calling an African-American female a piece of brown meat, Mr. Sims called a meeting with Plaintiff and her supervisor, Mike Waggoner, Ms. Ivasic, and her supervisor.  ECF Dkt. #25 at 241-242.  Mr. Sims warned those at the meeting that he had received a statement from a unit nurse that one of the supervisors had spoken about a CNM in a noncomplimentary manner.  ECF Dkt. #31, Exhibit #17.  Plaintiff indicated that at the meeting,  Mr. Sims noted an example that if a supervisor spoke of Ms. Travassos as being a racist, he would discipline that supervisor.  ECF Dkt. #25 at 244.

On February 9, 2006, Plaintiff's attorney, Warner Mendenhall, sent a letter to CEO Guggenheim outlining Plaintiff's concerns that she would be discussing at an upcoming meeting scheduled with CEO Guggenheim on February 14, 2006.  ECF Dkt. #30, Exhibit Q.  The letter indicated that Plaintiff was concerned about disability discrimination and racial harassment and she feared retaliation from Mr. Sims and Mr. Waggoner if they knew that she brought these concerns to CEO Guggenheim. *Id*.  Attorney Mendenhall discussed Plaintiff's belief that she had been racially harassed by Ms. Travassos and outlined the conversation by Mr. Sims to Plaintiff and others that she

6

would be disciplined if they reported any of Ms. Travassos' comments outside of the unit.  *Id.*

On February 14, 2006, CEO Guggenheim met with Plaintiff and discussed Plaintiff's concerns of caring for her grandson while on third shift, ongoing problems in the office, not being permitted to switch to second shift, and Ms. Travassos' racial comments.  ECF Dkt. #25 at 253. CEO Guggenheim ordered the Northfield campus police to investigate Ms. Travassos' comments, although Ms. Travassos denied making them.  ECF Dkt. #30, Exhibit R.  Plaintiff provided a statement to the police relating to the comments and Mr. Sims was interviewed as well.  *Id.*  Mr. Sims indicated that he was not aware of racial comments made by Ms. Travassos but he did hold a meeting at which he directed supervisors to report concerns about other supervisors to immediate supervisors and not to unit staff.  *Id.*

Ms. Travassos had a pre-disciplinary hearing with an attorney present, as well as Mr. Sims, Labor Relations Officer Wendy Ivory, and a hearing officer.  ECF Dkt. #31, Kajfasz Depo. at 57. The outcome of the hearing resulted in no discipline to Ms. Travassos as the allegations were found unsubstantiated.  *Id.*  at 60.  Ms. Travassos had been disciplined in the past for disrespectful conduct toward other employees.  *Id.*

On February 21, 2006, Mr. Waggoner placed in Plaintiff's work product file a copy of an e-mail that he wrote informing her that she did not need to call him at home when she was calling off of work.  ECF Dkt. #30, Exhibit U.  In this e-mail, Mr. Waggoner indicated that Plaintiff had called him three times at home, but she did not leave him a message.  *Id*.  He informed Plaintiff that she needed to follow the rules for reporting off, which did not include calling him at home.  *Id.*

On February 23, 2006, Plaintiff filed a charge of racial discrimination, harassment and retaliation alleging that Ms. Travassos made racial comments about her and her grandchildren, she was disciplined in December of 2005 for being disrespectful, and Mr. Sims told her that anyone who

accused another of being a racist would be disciplined.  ECF Dkt. #31, Exhibit #23.

On February 27, 2006, Plaintiff avers that she witnessed what she believed to be the possible abuse of a patient and she reported it according to Defendant's policies.  ECF Dkt. #31, Exhibit #s 24, 26.  An investigation ensued and Plaintiff completed an incident report, but she was told by Mr. Sims that she did not witness patient abuse and she should not finish completing the incident report, but rather she and Mr. Waggoner should address the "improper restraint" with the nurse.  ECF Dkt. #31, Exhibit 24.  Plaintiff tore up the incident report, but then called the investigating officer back and filed an incident report for an unusual non-criminal incident rather than an incident report for abuse of a patient.  *Id.*

On the same day, Mr. Waggoner issued Plaintiff a "Pattern Abuse Notification" letter, a form letter indicating that Plaintiff had a pattern of using sick leave "before and/or after weekends or regular days off."  ECF Dkt. #31, Exhibit 22.  The letter indicated that for the next six months, Plaintiff had to provide written verification from a physician for all future sick-related absences.  *Id*. Plaintiff alleges that she told Mr. Waggoner that her grandson was in the hospital around this same time.  ECF Dkt. #25 at 246-247.  The letter ended with the statement that "[c]ontinued 'pattern abuse' may result in disciplinary charges."  *Id.*

On March 1, 2006, Mr. Sims sent Plaintiff an e-mail reprimanding her for calling him "for the third time" for nonemergency situations. ECF Dkt. #30, Exhibit U.  Mr. Sims indicated that Plaintiff had unnecessarily called him at 2:30 a.m. about a patient situation that was adequately handled by the medical doctor on call and the administrator on duty.  *Id.*  He reinforced to Plaintiff that she was only to call him at home for emergency or overtime situations.  *Id.*

On March 27, 2006, Plaintiff received notice of a predisciplinary meeting which informed her that she was charged with

8

> violation of the Ohio Revised Code 124.34 - Misfeasance, Malfeasance or Nonfeasance in Office; Center Policy #3.10 Neglect of Duty - Failure to follow policies, procedures, directives of ODMH, hospitals, CSN; Failure to immediately report a violation of any work rule, policy, law, directive that could jeopardize the health, safety, and/or security of patients or clients; Interference in an Investigation - Interfering with an official investigation, including, but not limited to, giving false statements; and policy #6.08 - Incident Reporting.
>
> This is based on the following:
> On February 27, 2006, an investigation into patient abuse that occurred in February 2006 was initiated based upon an incident report that you filed.  Upon thorough review of the facts, it was determined that your claim of patient abuse was unsubstantiated.  You failed to timely report this incident to the physician.  Evidence further indicates that you deliberately made false statements in this matter.
>
> At this meeting you may explain why you believe the charges are not justified and you may present information regarding the incidents.

ECF Dkt. #30, Exhibit W.  According to Plaintiff, CNM Travassos delivered the notice to her "gleefully" and delivered it to her despite the fact that her own supervisor was there that day.  ECF Dkt. #25 at 260.

On the same day, Mr. Waggoner sent Plaintiff an e-mail reprimanding her for not following the chain of command in two instances.  ECF Dkt. #30, Exhibit V.  He suggested that Plaintiff follow the chain of command in the future.  *Id.*

Due to the incidents described above, Plaintiff resigned from Defendant's employ on March 30, 2006.  ECF Dkt. #25 at 263-265.  She called Ms. Kajfasz to resign and followed up with a resignation letter, effective immediately.  ECF Dkt. #30, Exhibits X, Y.

**B.      PROCEDURAL HISTORY**

On December 21, 2006, Plaintiff filed a complaint against Defendant in this Court alleging that Defendant discriminated against her based upon her disability in violation of 42 U.S.C. §12101, *et seq*. and Ohio Revised Code §4112.02, discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964 and Ohio Revised Code §4112.02, and

retaliated against her in violation of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3 and Ohio Revised Code §4112.02.  ECF Dkt. #1.  Plaintiff also alleged that Defendant wrongfully discharged her from her employment in violation of Ohio public policy.  *Id.* at 6.

On April 3, 2007, Plaintiff filed a stipulated notice of dismissal pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure dismissing her claims of disability discrimination pursuant to 42 U.S.C. §12101, *et seq*. and Ohio Revised Code §4112.02 with prejudice, and dismissing without prejudice her claims of race discrimination in violation of Ohio Revised Code §4112.02, retaliation in violation of Ohio Revised Code §4112.02, and wrongful discharge in violation of Ohio public policy.  ECF Dkt. #16.

Thus, the only remaining claims before this Court are Plaintiff's averments of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. On February 12, 2007, the parties consented to the jurisdiction of the undersigned.  ECF Dkt. #11.  On September 13, 2007, Defendant filed the instant motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  ECF Dkt. #30.  On October 15, 2007, Plaintiff filed a response to this motion, and on October 29, 2007, Defendant filed a reply.  ECF Dkt. #s 31, 33.

## C.    SUMMARY JUDGMENT STANDARD OF REVIEW

In its motion for summary judgment, Defendant asserts that no genuine issues of material fact exist to be litigated in this case and it is entitled to judgment as a matter of law on Plaintiffs' claims. ECF Dkt. #30 at 1.

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

10

FED. R. CIV. P. 56(C).  The party moving for summary judgment bears the initial burden of informing the Court of the basis for the motion and must identify the portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett* 477 U.S. 317, 323 (1986).  The moving party discharges this initial burden if it shows that the nonmoving party has failed to establish an essential element of the nonmoving party's case for which he bears the ultimate burden of proof at trial.  *Id.; Morales v. American Honda Motor Co., Inc.,* 71 F.3d 531, 535 (6th Cir. 1995).  The Court must view the evidence submitted in a light most favorable to the nonmoving party in order to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

If the moving party meets its burden on summary judgment, then the nonmoving party must take affirmative steps in order to avoid the entry of a summary judgment.  Fed.R.Civ.P. 56(e).  The nonmoving party must present additional evidence beyond the pleadings which shows by more than a scintilla of evidence support for his position.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  The Court must grant summary judgment unless sufficient evidence exists that favors the nonmoving party such that a judge or jury could reasonably return a verdict for that party.  *Id.* at 249.  The Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.*  If a party fails to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the Court must enter summary judgment.  *Celotex Corp*., 477 U.S. at 322.

## D.    LAW AND ARGUMENT

### 1.    RACE DISCRIMINATION

#### A.    STANDARDS OF REVIEW

Defendant first argues that it is entitled to summary judgment on Plaintiff's Title VII claim of race discrimination because she does not have evidence of direct discrimination and cannot establish the second and fourth elements of a *prima facie* case of indirect evidence of racial discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 26 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees "because of ... race, color, religion, sex, or national origin."  42 U.S.C. §2000e-2(a).  In order to establish a race discrimination claim under Title VII, a plaintiff must either "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).  The two principal means of proving discrimination under Title VII are disparate treatment and disparate impact.  *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

In the case at bar, Plaintiff offers no direct evidence of discrimination and concedes that hers is not a direct evidence case of discrimination.  As a result, Plaintiff's claim of race discrimination must be evaluated using the burden-shifting approach established in *McDonnell-Douglas*, 411 U.S. 792, as refined by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).  Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002).  The burden of establishing

a prima facie case "is not onerous, but one easily met." *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000).

If the plaintiff meets this burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Vaughn,* 291 F.3d at 906, *Abbott,* 348 F.3d at 542.  A defendant need not prove a nondiscriminatory reason for terminating an employee, but rather must only articulate a valid rationale. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 514 (1993)).

Once an employer offers a legitimate, nondiscriminatory reason for taking an adverse employment action, the burden of production shifts back to the plaintiff to show by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination. *Abbott*, 348 F.3d at 542.  A plaintiff can prove pretext by establishing that the defendant's stated reason (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to warrant the challenged conduct.  *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1020-1021 (6th Cir. 2000); *see also Abbott*, 348 F.3d at 542.  Further, the United States Supreme Court has found that a plaintiff may demonstrate pretext though the general policy and practice of the employer with respect to minority employment, and that statistics may be helpful to a determination of whether the challenged conduct conformed to a general pattern of discrimination against blacks. *McDonnel-Douglas,* 411 U.S. at 805.  If a plaintiff can show that the defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination. *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).  Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff at all times. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993).

In order to prove a *prima facie* case of race discrimination based on disparate treatment, the plaintiff must establish that (1) she is a member of a protected class, (2) she was subjected to an

13

adverse employment action or was discharged, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class if asserting race, color or gender discrimination. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002). The fourth element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably. *Mitchell*, 964 F.2d at 582-83; *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir.1995); *Clayton*, 281 F.3d at 610.

It is undisputed that Plaintiff in this case is African-American and is therefore a member of a protected class. ECF Dkt. #1. However, Defendant posits that Plaintiff cannot establish the second element of the *McDonnell Douglas* test, that is, she cannot show that she suffered an adverse employment action. Plaintiff counters that while Defendant did not fire her, it constructively discharged her by making a number of retaliatory reprimands. Up until the time that she began complaining about Ms. Trevassos' comments and her third shift reassignment, she had never been disciplined or received a negative performance evaluation. ECF Dkt. #31 at 12. However, Plaintiff laments that as she began to complain, she received a number of reprimands and finally resigned "because the only logical conclusion she could make about the pre-disciplinary meeting notice was that it was the end product of a long string of harassing incidents intended to culminate either in her termination, or her resignation." *Id*. at 12-13. The "last straw" as described by Plaintiff, was when she received the pre-disciplinary meeting notice from Ms. Trevassos, "one of her chief tormentors" and not her own supervisor. *Id.* at 13.

A plaintiff may establish an adverse employment action by showing that she was constructively discharged. *Logan v. Denny's, Inc*., 259 F.3d 558, 568 -569 (6th Cir. 2001), citing generally *Kocsis v. Multi-Care Mgmt.,* 97 F.3d 876, 886 (6th Cir.1996). In order to establish a constructive discharge, a plaintiff must provide evidence showing that (1) "the employer...

14

deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and (2) the employer did so "with the intention of forcing the employee to quit...." *Logan,* 97 F.3d at 568-569, quoting *Moore v. KUKA Welding Sys.,* 171 F.3d 1073, 1080 (6th Cir.1999).  A court must look at the employer's intent and the employee's objective feelings in order to determine if a constructive discharge has occurred.  *Id.* (citing *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir.1982)).

The Sixth Circuit Court of Appeals has adopted the factors used by the Fifth Circuit Court of Appeals in evaluating whether the first prong of the constructive discharge test is met:

> Whether a reasonable person would feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan,* 259 F.3d at 569, quoting *Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir.2000) (alterations omitted) (quoting *Barrow v. New Orleans Steamship Ass'n,* 10 F.3d 292, 297 (5th Cir.1994)).

## B.    ANALYSIS

In the case *sub judice*, the Court finds that Plaintiff has not met her reciprocal burden of showing that she has suffered an adverse employment action.  The elements required in order to establish a constructive discharge are conjunctive and the failure of a plaintiff to meet both elements necessitates the granting of summary judgment.  Plaintiff in this case focuses her effort on establishing that she suffered an adverse employment action through a constructive discharge.  However, the Court finds that all of Plaintiff's constructive discharge claims fail as a matter of law.

Generally, the allegations and the supporting evidence that Plaintiff provides fall short of establishing a constructive discharge because Plaintiff fails to show Defendant's intent to force her to quit and she fails to show that a reasonable person in her shoes would have felt compelled to

15

resign.  Applying the *Logan* factors to determine whether Defendant deliberately created intolerable working conditions as perceived by a reasonable person, Plaintiff does not allege a demotion, a reduction in salary or reduction in job responsibilities, and she does not aver a reassignment to menial or degrading work or an offer of early retirement or continued employment on terms less favorable than her former status.  Nor does Plaintiff allege that Defendant badgered or humiliated her in order to encourage her to resign.

Plaintiff does imply that Defendant harassed her in order to encourage her to resign or to make her feel as if Defendant was going to terminate her employment.  Plaintiff asserts that she "resigned because the only logical conclusion she could make about the pre-disciplinary meeting notice was that it was the end product of a long string of harassing incidents intended to culminate either in her termination, or her resignation."  ECF Dkt. #31 at 13.  As harassing incidents, Plaintiff cites to a shift reassignment upon her return from disability leave, the failure of Defendant to allow her to trade shifts, racially disparaging comments made by a CNM, an indirect threat to be disciplined if reports of racial comments were made to others, reprimanding e-mails that she received from her superiors, a pattern abuse notification and a pre-disciplinary hearing notice, a failure to promote her over Mr. Waggoner, and a request that she interview for a lateral position.  *Id.*  The Court addresses each of Plaintiff's incidents in turn.

## 1.    SHIFT REASSIGNMENT

Plaintiff first asserts that she was reassigned from first shift to third shift upon her return from disability leave while two other white females were restored to their same positions and shifts upon return from their disability leaves.  ECF Dkt. #31 at 16.  This argument fails for five reasons.  First, Plaintiff fails to rebut Defendant's legally supported assertion that a shift reassignment in and of itself does not constitute an adverse employment action when it does not result in a materially adverse

16

change in the terms and conditions of employment, including termination, demotion with decreased wages, loss of salary or loss of benefits.  ECF Dkt. #30 at 13, citing *Baker v. City of Toledo*, No. 3:05CV7315, 2007 WL 1101254 (N.D. Ohio Apr. 11, 2007).  Plaintiff alleges no such sufferance. Second, Plaintiff fails to show that Defendant reassigned her to third shift in order to deliberately create intolerable  working conditions to force her to quit.  Third, Plaintiff fails to rebut Defendant's assertion that her first shift position had been eliminated due to budgetary constraints and the shifts of the two other employees to whom she compares herself were not eliminated.  Moreover, while Plaintiff points to Staffing Rosters showing that a vacant nursing supervisor position went unfilled and she was not offered the position, she fails to rebut Defendant's recitation of Mr. Sims' testimony that this position was a part-time nursing supervisor position and not a full-time position.  ECF Dkt. #31, Exhibit #34 at 32-33.  Fourth, Plaintiff fails to come forward with evidence establishing that a reasonable person would have felt compelled to resign because of this reassignment.

Fifth, Plaintiff fails to show that either of the two employees to whom she compares herself are similarly situated to her in all relevant respects.  In order to establish disparate treatment for a race discrimination claim, Plaintiff must show that the employees with whom she compares herself are similar in "all of the relevant aspects."  *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 351 (6th Cir. 1998).  Defendant points out that one of Plaintiff's comparators, Ms. Fenton, is not similarly situated to Plaintiff because she is a nurse, not a Psych/MR Nurse Supervisor like Plaintiff. Plaintiff does not rebut this.  Further, the position of Ms. Chasteen, the other employee that Plaintiff alleges returned to her same shift upon return from disability leave, was not eliminated due to budgetary constraints.  Plaintiff fails to contradict this assertion as well.  Accordingly, Plaintiff fails to show that she was constructively discharged based upon Defendant's placement of her on third shift upon her return from disability leave.

17

## 2.    DENIAL OF REQUEST TO TRANSFER SHIFTS

Plaintiff also complains that Defendant's denial of her request to transfer shifts with a co-worker was racial discrimination and was one of the incidents that led to her constructive discharge. ECF Dkt. #31 at 16.  However, the Sixth Circuit Court of Appeals has held that "a purely lateral transfer or denial of the same, which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination purposes." *Momah v. Dominguez,* No. 03-2561, 239 Fed.Appx. 114, 123, 2007 WL 1804353 at **9 (6th Cir. 2007), citing *Kocsis,* 97 F.3d at 886. Plaintiff does not indicate that the denial of her transfer from third shift to first shift caused a decrease in title, pay or benefits.  Accordingly, this denial does not constitute an adverse employment action.  Plaintiff also fails to show that Defendant intended to force her to quit by denying her request to transfer shifts.

## 3.    WRITTEN REPRIMANDS, E-MAILS, PATTERN ABUSE NOTIFICATION LETTER AND PRE-DISCIPLINARY HEARING NOTICE

Plaintiff also avers that the one written reprimand that she received, along with the e-mails sent to her by her superiors, and the pattern abuse letter and the pre-disciplinary hearing notice all contributed to her constructive discharge.  Defendant asserts that none of these actions constituted adverse employment actions and addresses each in turn.  ECF Dkt. #30 at 12-13.  Defendant cites to caselaw holding that written reprimands are insufficient to establish adverse employment actions, and threats to impose adverse employment actions are not themselves considered adverse employment actions.  ECF Dkt. #30 at 11-12, citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996), *Fernandez v. City of Pataskala*, No. 2:05-CV-75, 2006 WL 3257389, citing *Allen v. Michigan Dep't of Corrs.*, 165 F.3d 405, 409-410 (6th Cir. 1999), and *Macklin v. Turner*, No. 1:03CV2347, 2005 WL 2211170 (N.D. Ohio Sept. 9, 2005).  Defendant applies these cases to assert

that Plaintiff cannot establish an adverse employment action from one written reprimand relating to the tone of an e-mail that she sent to her supervisor.  ECF Dkt. #30 at 11-12.  Defendant also cites to *Mitchell v. Vanderbilt University,* 389 F.3d 177, 182 (6th Cir. 2004) for the proposition that the other notifications sent to Plaintiff, including e-mails regarding calling supervisors at home and not following the chain of command, and the pattern abuse notification are not adverse employment actions because they were, at a maximum, threats to impose adverse employment actions which are not themselves adverse employment actions.  ECF Dkt. #30 at 12.

Plaintiff fails to point the Court to legal support contradicting Defendant's assertions and fails to show that these actions were implemented in order to force her to resign.  Further, the pre-disciplinary hearing notice issued to Plaintiff was a tool to provide Plaintiff with the opportunity to receive notice and be heard and at most was a threat to impose discipline as Plaintiff fails to show that discipline always results from these hearings.

Accordingly, Plaintiff has failed to meet her burden on summary judgment of showing that these activities constituted adverse employment actions.

### 4.    DEROGATORY STATEMENTS BY MS. TRAVASSOS

Plaintiff also complains of the derogatory comments made by Ms. Travassos as leading to her constructive discharge.  ECF Dkt. #31 at 5.  While Ms. Travassos may have created intolerable working conditions with derogatory comments, Plaintiff cannot show that Defendant was responsible for those comments or that Defendant intended for Ms. Travassos to make those comments in order to force Plaintiff to resign.  In fact, Plaintiff acknowledges that CEO Guggenheim ordered an investigation and a pre-disciplinary hearing regarding Ms. Travassos' use of racially derogative comments after she informed him of the statements.  ECF Dkt. #31 at 7-8. Moreover, derogatory comments made by a supervisor on a shift different than that of Plaintiff and by one who had no input

19

into Plaintiff's discipline fail to establish Defendant's intent or the existence of a discriminatory motive on the part of Defendant in taking the measures that it did against Plaintiff. *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998), quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989); *Martin v. U.S. Playing Card Co.*, No. 97-3391, 1998 WL 869970 (6th Cir. 1998), unpublished.

### 5.    **FAILURE TO PROMOTE**

Plaintiff also complains about her failure to receive a promotion to a CNM over Mr. Waggoner in 2003. ECF Dkt. #31 at 16. However, Defendant points out that this charge is untimely because Plaintiff's OCRC charge was filed on November 9, 2005, well after the promotion of Mr. Waggoner in 2003 and well after the Equal Employment Opportunity Commission statute of limitations of 300 days. ECF Dkt. #33 at 6, citing *Nichols v. Muskingum College*, 318 F.3d 674, 678 (6th Cir. 2003). Defendant further asserts that Plaintiff failed to mention the 2003 promotion in her November 9, 2005 OCRC charge and claimed that the discrimination in promotion began on July 15, 2005. ECF Dkt. #33 at 6, citing ECF Dkt. #25 at 133.

A plaintiff must timely file a charge with the EEOC before filing a Title VII lawsuit. *See Alexander v. Local 496, Laborers' Intern. Union of North America*, 177 F.3d 394, 407 (6th Cir. 1999), citing *EEOC v. Atlas Paper Box Co.*, 868 F.2d 1487, 1495 (6th Cir. 1989). If the alleged discrimination occurred more than 180 days before the plaintiff filed an EEOC charge, the plaintiff is barred from bringing these claims. *See id.* However, the state of Ohio is a "deferral state," and as such, Ohio has enacted its own laws regarding employment discrimination, one of which provides that the plaintiff must file with the EEOC within 300 days of the alleged discriminatory act. *See id.,* citing 42 U.S.C. § 2000e-5(e); *EEOC v. Penton Indus. Pub. Co.*, 851 F.2d 835, 837 n. 5 (6th Cir. 1988). Thus, a plaintiff must bring a charge with the EEOC within 300 days of the alleged

discriminatory act.  *Id.*  If a plaintiff fails to first present a claim to the EEOC, she may not bring it to this Court on appeal.  *Tisdale v. Federal Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005).  "The judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge." *Id.*  However, if the facts of the charge would cause the EEOC to investigate an unrelated charge, the plaintiff can bring that claim to this Court.  *Id.*

The Court finds that Plaintiff is barred from asserting a claim of failure to promote her over Mr. Waggoner in 2003.  In her OCRC charge, Plaintiff identifies the date of her discrimination as "July 15, 2005 - continuing." ECF Dkt. #30, Exhibit E.  She makes no mention of the 2003 denial of promotion and offers no explanation or legal support why this Court should consider this claim now.  She is well over the 300-day time limitation in which to file a charge based upon this incident.

Plaintiff also mentions in her deposition that she was denied a promotion in 2005 over Kim Knoll because the people that interviewed her did not want her to have the promotion and automatically scored her lower because she was African-American.  ECF Dkt. #25 at 159.  However, Plaintiff offers no further comment, allegations or legal support to justify further consideration of this assertion.

**6**.        **INTERVIEWING FOR LATERAL POSITION**

Plaintiff further asserts that she was constructively discharged and discriminated against because she was required to interview for a lateral position as a Psych/MR Nurse Supervisor in Defendant's Cleveland Office in October 2005.  ECF Dkt. #31 at 16.  Plaintiff complains that interviews were never required before and she refused to interview for the position based upon this past practice.  *Id.*  However, as discussed above, a lateral transfer or denial thereof is not an adverse employment action if it results in no decrease in title, pay or benefits. *Momah,* 2007 WL 1804353 at \*\*9, citing *Kocsis,* 97 F.3d at 886.  Thus, this assertion fails as a matter of law.

<u>C</u>.        <u>**CONCLUSION**</u>

In sum, the Court GRANTS Defendant's motion for summary judgment on Plaintiff's racial discrimination claims. ECF Dkt. #30. Plaintiff cannot establish the essential elements to show that she was constructively discharged because she fails to show that Defendant intentionally created intolerable working conditions over which a reasonable person would resign and that Defendant did so in order to force her to quit.

**2.        RACIAL HARASSMENT/HOSTILE WORK ENVIRONMENT**

Plaintiff also raises a racial harassment claim based upon the comments that Ms. Travassos made to her and Ms. Ivasic which she alleges Defendant failed to stop or discipline. ECF Dkt. #31 at 13-15. Defendant moves for summary judgment on this claim, contending that Plaintiff cannot establish a *prima facie* case of hostile work environment based upon race. ECF Dkt. #30 at 17.

Discrimination in the form of a hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Racially derogatory comments need not be directed at a plaintiff in order to establish harassment. *Jackson v. Quanex Corp.,* 191 F.3d 647, 661 (6th Cir.1999). Further, a plaintiff need not even witness the comments directly in order to allege that they contributed to a hostile work environment. *Id.* at 661. In order for Plaintiff to establish a *prima facie* case of hostile work environment based on race, she must establish the following elements:

> 1. She was a member of a protected class;
>
> 2. She was subjected to unwelcomed racial...harassment;
>
> 3. The harassment was based on race...;

22

> 4. The harassment had the effect of unreasonably interfering with [her] work performance by creating an intimidating, hostile, or offensive work environment; and
>
> 5. The existence of employer liability (the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive action).

*Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999), citing *Risinger v. Ohio Bur. of Worker's Compensation,* 883 F.2d 475, 484 (6th Cir. 1989).

Even viewing the evidence in a light most favorable to Plaintiff in this case and rejecting Defendant's challenges to Plaintiff's ability to meet the third element of a racially hostile work environment, the Court finds that Plaintiff cannot establish the last two elements of a hostile work environment. In order to meet the fourth prong of the *prima facie* case, Plaintiff must come forth with evidence showing that under the "totality of the circumstances", the harassment was "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Clay v. United Postal Service, Inc.,* 501 F.3d 695, 707 (6th Cir. 2007), citing *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 560, 562 (6th Cir.1999) (quoting *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The requirement that the harassment be severe or pervasive involves both an objective and a subjective component. *Harris,* 510 U.S. at 21-22. The court must review "'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'" under the totality of the circumstances. *Clay,* 501 F.3d at 707, quoting *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 733 (6th Cir.2006) (alterations in original) (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367). The Sixth Circuit has noted that while determining whether conduct is severe or pervasive is a question of fact, summary judgment has nevertheless been granted in cases where, as a matter of law, the

conduct was not sufficiently severe or pervasive. *Clay,* 501 F.3d at 707, citing *e.g., Smith v. Leggett Wire Co.,* 220 F.3d 752, 760-61 (6th Cir.2000); *Burnett v. Tyco Corp.,* 203 F.3d 980, 984-85 (6th Cir.), *cert. denied,* 531 U.S. 928, 121 S.Ct. 307, 148 L.Ed.2d 246 (2000).

In *Clay*, the district court had found that the fifteen specific incidents complained of as harassment by the plaintiff over a two-year period did not rise to the level of severity or pervasiveness that would unreasonably interfere with the employee's ability to work. 501 F.3d at 707. The Sixth Circuit agreed, finding that most of the incidents were "mere offensive utterances," which were not actionable under Title VII. *See Harris,* 510 U.S. at 21, 114 S.Ct. 367. *Compare Jordan,* 464 F.3d at 598. In *Hafford v. Seidner*, the Sixth Circuit Court of Appeals noted the "recurring point" in the Supreme Court's opinions that " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' " and that "conduct must be extreme to amount to a change in the terms and conditions of employment." 183 F.3d 506, 512-513 (6th Cir. 1999), quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1998) (citations omitted).

In this case, Plaintiff recounts one racial comment made directly to her by Ms. Travassos "in December 2005 and early 2006" and a few comments made to Ms. Ivasic about African-Americans and related to Plaintiff by Ms. Ivasic. ECF Dkt. #1 at 3. After they learned that an African-American staff member would be off of work indefinitely due to kidney failure, Ms. Travassos allegedly said to Plaintiff that she "did not care about them. Let them die. Let them all die" and she also repeatedly called Plaintiff "fat and lazy" which Plaintiff interpreted as racially hostile. ECF Dkt. #25 at 227-234. The undersigned questions whether the "fat and lazy" comments had anything to do with Plaintiff's race. However, the other comment was certainly based upon race and was offensive. As were the other comments that were not directed to Plaintiff but were told to her by Ms. Ivasic. Ms.

24

Ivasic told Plaintiff that Ms. Travassos had called Plaintiff's grandson a "black bastard" and said that "all black people do is lay around and make babies that white people have to support." *Id*. at 229, 232-233.  Ms. Ivasic had also informed Plaintiff that Ms. Travassos had called another African-American nurse a "lazy piece of wasted brown meat" and said that another African-American nurse was not very smart. *Id*.

While these comments were offensive and based upon race, however, they do not, as a matter of law, rise to level of pervasiveness or severity required to maintain an action under a hostile work environment. *Clay*, 501 F.3d 695 at 707-708.  Under the totality of the circumstances, Ms. Travassos comments were isolated and not ongoing, and while they constituted more than "simple teasing", they were not sufficiently extreme in seriousness to elevate them to pervasive or severe enough to amount to a change in the terms and conditions of Plaintiff's employment.

Moreover, even if Plaintiff showed that the derogatory comments were indeed sufficiently severe or pervasive, she cannot establish the employer liability prong.  In her response to the motion for summary judgment, Plaintiff indicates that she orally "reported at least one of these comments" to Ms. Veal.  ECF Dkt. #31 at 6.  She testified in her deposition that Ms. Veal told her to report the comments to Mr. Sims, which she did.  ECF Dkt. #25 at 234.  Plaintiff stated that when she orally informed Mr. Sims of the comments, he ignored her.  *Id.* Plaintiff further indicated that she did not file anything in writing at her place of employment through their EEO Office relating to the comments and instead chose to go to the OCRC on the same day that Mr. Sims failed to respond to her.  *Id.*  Plaintiff further testified that she told Mr. Waggoner of the comments and while he did schedule a meeting, she could not make it because she was off sick and she attempted to contact him again about rescheduling, but he never contacted her back about the meeting. *Id.*  Nevertheless, after Plaintiff's attorney wrote a letter to CEO Guggenheim outlining the racial comments made by Ms.

Travassos, Mr. Guggenheim launched an investigation. ECF Dkt. #25 at 250; ECF Dkt. #31 at 7. Defendant's police officers took Plaintiff's statements about Ms. Travassos' comments and Ms. Travassos' underwent a pre-disciplinary meeting. ECF Dkt. #31, citing Kajfasz Depo. at 57. The charges against Ms. Travassos were found to be unsubstantiated. Kajfasz Depo. at 60. Plaintiff calls Defendant's response manifestly indifferent or unreasonable as "seemingly everyone–knew or should have known of the conduct" and "Trevassos was never disciplined". *Id.* at 16.

The timing of all of these actions taken by Plaintiff and Defendant in response to Ms. Travassos' comments is confusing to the undersigned. Plaintiff alleges that she filed her first OCRC charge on November 9, 2005 based upon disability discrimination only, although she wanted to raise racial issues as well. ECF Dkt. #1 at 3. However, she avers that she was subjected to Ms. Travassos' racially derogatory comments "in December 2005 and early 2006". *Id.* She testified in her deposition that she spoke to Ms. Veal about the comments and Ms. Veal told her to speak to Mr. Sims. ECF Dkt. #25 at 234. She indicated that she filed her OCRC charge the same day that Mr. Sims refused to talk to her after she reported Ms. Travassos' comments. *Id.* at 234-235.

The day that Plaintiff filed her OCRC charge about racial harassment was February 23, 2006. ECF Dkt. #25 at 234-235; ECF Dkt. #30, Exhibit 14. But by this time, Defendant had already taken corrective actions on Ms. Travassos' comments as Plaintiff's attorney had written CEO Guggenheim a letter about the racial harassment on February 9, 2006 and Plaintiff testified that she met with CEO Guggenheim on February 14, 2006 and he told her he would launch an investigation into the allegations. ECF Dkt. #25 at 251-252; ECF Dkt. #30, Exhibit Q. Plaintiff testified that she was thereafter interviewed for the investigation and completed a statement. *Id.*

Despite the timing disparities, Plaintiff cannot establish employer liability for the harassment by a supervisor. Vicarious employer liability applies when an immediate or successively higher

26

supervisor creates an actionable hostile work environment. *Clark v. U.S. Postal Serv.,* 40 F.3d 796, 803 (6th Cir. 1994).  However, since "strict liability is imposed on employers for the harassing conduct of their supervisors, there is an exception to liability for the employer: so long as the harassment did not result in a negative tangible employment action for the victim, the employer has an available affirmative defense." *Id*.  In order to use the affirmative defense, the employer must show by a preponderance of the evidence that (a) "the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-808, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).  If a plaintiff establishes a negative tangible employment action, such as a demotion, discharge, or undesirable transfer, the employer may not assert the defense.

Here, Plaintiff claims that she suffered a constructive discharge due to Ms. Travassos' racially derogatory comments and Defendant's lack of timely action on those comments.  She asserts that a constructive discharge is considered an adverse employment action in harassment cases "when the plaintiff shows that the 'abusive working environment became so intolerable that her resignation qualified as a fitting response.'"  ECF Dkt. #31 at 15, quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).  However, as found above, the Court holds as a matter of law that Plaintiff's working environment in this case was not so intolerable as to qualify a resignation as a fitting response.  Plaintiff alleges one racial comment directed at her, repeated comments about her being "fat and lazy" which she interpreted as racially hostile, and other offensive comments made to Ms. Ivasic about African-Americans.  Again, while rude, demeaning and offensive, these comments do not rise to the level of creating an environment "so intolerable" as to render resignation a fitting response.

27

Thus, Defendant can raise the affirmative defense to the claim by showing by a preponderance of the evidence that (a) it "exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807-808.  Defendant asserts that it correctly and promptly addressed the issue as Plaintiff first notified a supervisor in February 2006 of the comments, and by the end of February 2006, Defendant had launched an investigation into the situation and Plaintiff had given a statement on the comments.  Further, Ms. Travassos was brought forth for a pre-disciplinary hearing.  While the allegations were found to be unsubstantiated, Defendant nevertheless promptly took reasonable steps to prevent and correct any racially harassing behavior.  Moreover, Defendant points out that Plaintiff was aware that it had an Equal Employment Opportunity policy which provided employees with a procedure for complaint.  ECF Dkt. #25 at 157-158.  However, Plaintiff acknowledged that she did not make any written filings about Ms. Travassos' comments with her supervisor, Defendant's EEOC office, or anyone besides the OCRC.  *Id.* at 234. Accordingly, Plaintiff did not take advantage of the preventive or corrective opportunities that Defendant offered through its Equal Employment Opportunity Policy and office.

Finally, the Court notes that Plaintiff reports no racially harassing behavior occurring from Ms. Travassos  after Defendant took the steps that it did against Ms. Travassos.  While Plaintiff does raise issues relating to Defendant reprimanding her and sending her corrective e-mails, a pattern abuse notification and a pre-disciplinary hearing notice after she made the allegations against Ms. Travassos, these actions are not part of a racial harassment claim but are addressed in the next section relating to Plaintiff's claims of retaliation.

For these reasons, the Court GRANTS Defendant's motion for summary judgment on

Plaintiff's racial harassment claims.  ECF Dkt. #30.

### 3.    **RETALIATION**

Finally, Defendant moves for summary judgment on Plaintiff's claims that Defendant subjected her to a pattern of racial retaliation that included placing negative documents in her work product file after she filed her first and second OCRC charges, and after CEO Guggenheim received the letter from her attorney.  ECF Dkt. #30 at 14; ECF Dkt. #31 at 17-18.  Plaintiff claims that once she filed her first OCRC charge, Mr. Sims and Mr. Waggoner filled her work product file with negative documents and the work product files were used for evaluations, raises and discipline.  ECF Dkt. #31 at 19.

Under Title VII, a plaintiff may show retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework. *See Abbott v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir.2003) (referring to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).  Without direct evidence of retaliation, retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework that govern discrimination claims. *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 563-64 (6th Cir.2004).

Plaintiff does not bring evidence of direct retaliation.  Accordingly, in order to establish a *prima facie* case of retaliation under Title VII, she must show that (1) she engaged in activity protected by Title VII; (2) Defendant knew that she engaged in such activity; (3) Defendant thereafter took adverse employment action against Plaintiff; and (4) a causal connection existed between the protected activity and the adverse employment action. *McDaniel v. Potter,* Nos. 1:06 CV 0803, 1:06 CV 1371, 2007 WL 3165807 (N.D. Ohio 2007), quoting *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 736 (6th Cir.2006); and citing *Ford v. General Motors Corp.,* 305 F.3d 545, 552-53 (6th Cir. 2002).

29

Defendant first asserts that this Court should grant summary judgment as to Plaintiff's claims of Defendant's retaliation by the denial of her shift change request with Ms. Shelton and a written reprimand issued by Mr. Waggoner. ECF Dkt. #30 at 15. Defendant contends that Plaintiff cannot show that it knew of her OCRC charges and her attorney's letter to CEO Guggenheim because the shift change denial and the written reprimand preceded her first and second OCRC charges, and the letter sent to CEO Guggenheim by her attorney. *Id.*

The Court GRANTS Defendant's motion for summary judgment on these claims because Plaintiff cannot establish that Defendant knew that she was engaging in protected activity when her shift change request was denied and when Mr. Waggoner issued a written reprimand. Plaintiff testified in her deposition that her request to switch shifts was denied on July 29, 2005, four months before she filed her first OCRC charge, and six months before her attorney sent a letter to CEO Guggenheim and she filed her second OCRC charge. *See* ECF Dkt. #25 at 116-117; ECF Dkt. #30, Exhibits E, Q, N. Accordingly, Defendant could not have retaliated against Plaintiff for the filing of her OCRC charge as the shift denial preceded her protected activities. Further, Plaintiff received the written reprimand from Mr. Waggoner concerning a disrespectful e-mail that she had sent him on November 8, 2005, also before she filed her first and second OCRC charges and before her attorney sent Mr. Guggenheim a letter. ECF Dkt. #30, Exhibits, E, K, Q, N. Therefore, Mr. Waggoner's reprimand could not have been in retaliation for the OCRC charges or her attorney's letter to CEO Guggenheim as the reprimand occurred before all of these actions. Since both of these actions by Defendant preceded Plaintiff's OCRC charges, and her attorney's letter to CEO Guggenheim, Plaintiff cannot establish that Defendant knew of her protected activities because they did not exist prior to the denial of the shift change or the written reprimand. Thus, the Court GRANTS Defendant's motion for summary judgment on these claims. ECF Dkt. #30.

Defendant moves for summary judgment on the rest of Plaintiff's racial retaliation claims, arguing that Plaintiff suffered no retaliatory adverse employment action.  ECF Dkt. #30 at 15.  Plaintiff counters that her adverse employment action was a constructive discharge because after she filed her first OCRC complaint in November 2005, she was "bombarded" with critiques and e-mails from Mr. Sims and Mr. Waggoner, which impacted employee evaluations and raises.  ECF Dkt. #31 at 18-19.  Plaintiff further asserts that the "papering" of her work product file escalated after her attorney wrote the letter to CEO Guggenheim and she filed her second OCRC claim in February 2006.  *Id.* at 19.

The Court agrees with Defendant and GRANTS its motion for summary judgment on Plaintiff's racial retaliation claims.  In asserting that she suffered a constructive discharge based upon racial retaliation, Plaintiff asserts the following:

> Once she filed her first OCRC complaint in November 2005, Sims and Waggoner bombarded Sams with critique after critique, e-mail after e-mail, that were all to go into Sams' 'work product' file.  Employee evaluations - and, therefore, raises- were based on its contents.  Discipline was based on it.  Any criticism placed in one's work product file, Sams testified, was tantamount to an official write-up.  The 'papering' escalated, especially after Guggenheim received Sams' attorney's letter and Sams filed her second OCRC charge in February 2006, to the point that Sams received another 'work product file' reprimand from Waggoner on the same day that Trevassos happily handed Sams her pre-disciplinary meeting notice.  Facing these circumstances, any reasonable employee would have come to two conclusions: 1) that she was being made to pay for speaking out; and 2) that she was surely going to be fired- and soon.

ECF Dkt. #31 at 19.

The Court has already set forth the standard for establishing a constructive discharge in Part D1 entitled "Race Discrimination" *supra*.  Here, as found in Part D1, although Plaintiff asserts that she suffered a constructive discharge due to the "bombardment" of her work product file with negative documents following her OCRC charges and the letter sent by her attorney, she fails to point

31

the Court to legal support contradicting Defendant's assertions that written reprimands are insufficient to establish adverse employment actions, and threats to impose adverse employment actions are not themselves considered adverse employment actions.  ECF Dkt. #30 at 11-12, citing *Kocsis*, 97 F.3d at 885, *Fernandez*, 2006 WL 3257389, citing *Allen*, 165 F.3d at 409-410 and *Macklin*, 2005 WL 2211170; *Mitchell,* 389 F.3d at 182.  Further, she fails to show that she suffered a demotion, reduction in salary, reduction in job responsibilities, reassignment, or an offer of early retirement or continued employment on less favorable terms.  *See Logan*, 259 F.3d at 569. Accordingly, Plaintiff cannot establish a constructive discharge and therefore cannot show that Defendant took adverse employment actions against her.

Even presuming that Plaintiff could establish the first three prongs of racial retaliation, including adverse employment action, Plaintiff's claim fails because she cannot show that a causal connection existed between her protected activity and any alleged adverse employment action.  "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000).  The only evidence that Plaintiff produces relative to establishing a causal connection is the fact that she received e-mail critiques, a written reprimand, a pattern abuse notification and a pre-disciplinary hearing notice after she filed her OCRC charges and her attorney sent a letter to CEO Guggenheim.  However, "temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Id.* at 566.  In *Nguyen,* 229 F.3d at 563, the Sixth Circuit Court of Appeals "rejected the proposition that temporal proximity is enough, noting that the plaintiff had pointed to no additional evidence to support a finding that the protected activity and the adverse action were connected." *Id.*, quoting *Cooper v. City of Olmstead*, 795 F.2d

32

1265 (6th Cir. 1986).

Besides timing, Plaintiff produces no evidence to show that her OCRC claims or her attorney's letter to CEO Guggenheim caused Defendant to take these allegedly adverse employment actions.  Consequently, her retaliation claim is dismissed for failure to meet all of the conjunctive requirements of a retaliation claim.

**D.**	**CONCLUSION**

For the above reasons, the Court GRANTS the motion for summary judgment filed by Defendant.  ECF Dkt. #30.  The Court therefore dismisses with prejudice all of Plaintiff's claims against Defendant.


Date:  12/5/2007	s/*George J. Limbert*
	GEORGE J. LIMBERT
	U.S. MAGISTRATE JUDGE

33